IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 1, 2021

## IN RE: NI'KAIYA R.

**Appeal from the Juvenile Court for Hamilton County**
**No. 293,740  Robert D. Philyaw, Judge**

_____

**No. E2021-00517-COA-R3-PT**

_____

In this termination of parental rights case, Father/Appellant appeals the termination of his parental rights to the minor child on the grounds of: (1) abandonment by failure to visit, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i); (2) failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14); and (3) grounds applicable only to putative fathers, Tenn. Code Ann. § 36-1-113(g)(9).  Father/Appellant also appeals the trial court determination that termination of his parental rights is in the child's best interest.  Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Brian A. Caldwell, Chattanooga, Tennessee, for the appellant, Charles M.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

David C. Veazey, Chattanooga, Tennessee, for the appellee, Lindsay R.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. Background

Lindsay R. ("Mother") has eight biological children, none of whom are in her custody. The instant appeal involves only one of those children, Ni'Kaiya R. (d.o.b. October 2017) (the "Child"). Appellant Charles M. ("Father") is Ni'Kaiya's biological father; the Child has never lived with Father. On May 7, 2019, the Tennessee Department of Children's Services ("DCS," and together with Mother, "Appellees") filed a petition for temporary custody of the Child and her half-brother, Kameron, in the Juvenile Court of Hamilton County ("trial court"). As grounds, DCS averred that the children were subject to drug exposure, environmental neglect, and exposure to domestic violence in Mother's home. Father was incarcerated at the time, but he did participate, by video conference, in the adjudicatory hearing on May 29, 2019. On July 15, 2019 the trial court entered an order, wherein it adjudicated the children dependent and neglected because Mother was "unable to provide a safe and stable home due to illegal drug use, domestic violence[,] and unresolved mental health issues," and because Father was incarcerated and "[would] remain incarcerated for another seven (7) months." Furthermore, because there was uncertainty as to Father's paternity of the Child, the trial court ordered DNA parentage testing.

When Ni'Kaiya came into state custody, she was 19 months old; she could not walk, had severe separation anxiety, and had a large abscess on her head from an infection. Both she and Kameron had head lice. Fortunately, the children have made significant progress in the foster home. During her testimony, the Child's foster mother stated that the Child is "extremely intelligent" and "right on par" in her development. On December 26, 2019, another of the Child's half-siblings, Tyrell P., was taken into state custody. Tyrell was placed in the same foster home as Ni'Kaiya and Kameron, where all three children have remained since that time. The testimony indicates that all three children "have an amazing bond," with each other and with their foster parents. The foster parents wish to adopt the three children. As discussed in further detail below, both Teara Jones, the DCS Family Service Worker ("FSW") for the case, and the foster mother testified that they have significant concerns that the Child's behavior and progress would regress if she was removed from the current placement.

It is undisputed that, in early 2017, soon after Mother learned she was pregnant with the Child, she informed Father that he could be the father. Although Father attended the adjudicatory hearing on May 29, 2019 (and was aware, at that time, that the Child was in state custody), he made no effort to establish paternity or to otherwise establish any relationship with the Child.

On July 2, 2020, DCS filed a petition to terminate Mother's and Father's parental rights to Ni'Kaiya. As ground for termination of Father's parental rights, DCS averred:

(1) abandonment by failure to visit, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i); (2) failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14); and (3) putative father grounds, Tenn. Code Ann. § 36-1-113(g)(9). DCS also averred that termination of Father's parental rights was in the Child's best interest. On July 22, 2020, three weeks after the petition was filed, Father's wife left a voicemail for FSW Jones inquiring about the case and asking to arrange a DNA test for Father. The next day, FSW Jones called Father's wife and told her that DCS had arranged a DNA test. Father submitted to DNA testing in August 2020 and was confirmed as the Child's biological father. After receiving the results of the DNA test, Father, who was incarcerated at the time, inquired with DCS about arranging visitation. Due to Father's incarceration, a video hearing was held, with Father participating. DCS informed Father that it would not arrange visitation at that time because the petition to terminate his parental rights was set for September 2020. The hearing was subsequently rescheduled to December 14, 2020. A guardian ad litem was appointed for Ni'Kaiya on August 19, 2020; an attorney was appointed for Father on September 23, 2020.

The trial court heard the petition to terminate parental rights over two days, December 14, 2020 and April 12, 2021. On February 22, 2021, Father filed a written motion for visitation with the Child. By order of March 30, 2021, the trial court found that the motion "should be continued until the close of proof in the termination hearing." Accordingly, Father has never visited the Child and has no relationship with her.

At the time of the hearing on the petition to terminate his parental rights, Father was not incarcerated. He lived with his wife, her two children (ages four and five), and another of Father's biological children (age eleven) in Millington, Tennessee. His in-laws also lived in the home. Father was unemployed and received $783 per month in disability benefits due to a leg injury he sustained in a 2017 automobile accident. Prior to the COVID-19 pandemic, Father's wife worked cleaning houses. However, Father testified that since the pandemic, she had been unemployed, although she receives child support for her two children. Father stated that he and his wife pay $500 per month in rent.

Following the hearing, on April 28, 2021, the trial court entered an order containing findings of facts and conclusions of law. On June 17, 2021, the trial court entered its final order terminating Father's parental rights on the grounds asserted by DCS in its petition and on its finding that termination of Father's rights is in the Child's best interest. Father appeals.

## II. Issues

There are two dispositive issues, which we state as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds relied on by the trial court in terminating Father's parental rights.
2. If so, whether termination of Father's parental rights is in the Child's best interest.

- 3 -

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524. With the foregoing in mind, we turn to analyze the grounds that the trial court relied on in terminating Father's parental rights.

## IV. Grounds for Termination

Here, the trial court found three grounds for termination of Father's parental rights. Some of the grounds are applicable to parents generally, *see* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-113(g)(14), and one is applicable only to putative fathers. Tenn. Code Ann. § 36-1-113(g)(9)(A). The term "parent" is defined broadly in Tennessee Code Annotated section 36-1-102 as "any biological, legal, adoptive parent or parents or, for purposes of §§ 36-1-127—141, stepparents[.]" Tenn. Code Ann. § 36-1-102(37). In contrast, a putative father is defined as

> a biological or alleged biological father of a child who, at the time of the filing of the petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, meets at least one (1) of the criteria set out in § 36-1-117(c), has not been excluded by DNA testing as described in § 24-7-112 establishing that he is not the child's biological father or that another man is the child's biological father, and is not a legal parent[.]

Tenn. Code Ann. § 36-1-102(44). Here, there is no dispute that Father is the biological parent of the Child; however, he has not been adjudicated as the legal parent. Thus, both grounds applicable to parents generally and to putative fathers specifically are appropriate in this case.

Furthermore, although only one ground must be proven by clear and convincing evidence in order to terminate a parent or guardian's parental rights, the Tennessee

Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d at 251 n.14. Here, the trial court terminated Father's parental rights on the grounds of: (1) abandonment by failure to visit; (2) failure to manifest a willingness and ability to assume custody; and (3) putative father grounds under Tennessee Code Annotated section 36-1-113(g)(9). We begin our discussion with the first two grounds, which are applicable to parents generally.

## A. Abandonment by Failure to Visit

The trial court found, by clear and convincing evidence, that Father abandoned the Child. Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

As is relevant to this appeal, Tennessee Code Annotated section 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

> ***

> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

- 6 -

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

We first note that prior to July 2018, a petitioner seeking to terminate a parent's rights based on abandonment bore the burden of proving that the parent's failure to visit was "willful." *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2016). However, the Tennessee General Assembly amended Tenn. Code Ann. § 36-1-102(1)(A)(i) on July 1, 2018, removing the willfulness requirement from the definition of abandonment by failure to visit. *See* 2018 Tenn. Pub. Acts ch. 875, § 2. The version of the statute applicable to Father in this case states:

> It shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of the evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure.

Tenn. Code Ann. § 36-1-102(1)(I). Father did not raise his lack of willfulness as an affirmative defense in his amended answer to the petition to terminate his rights. Therefore, pursuant to Tenn. Code Ann. § 36-1-102(1)(I), he waived the absence of willfulness as a defense to the ground of abandonment by failure to visit and support. Tenn. R. Civ. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see **In re Ashlynn H.**,* No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at \*4 (Tenn. Ct. App. May 28, 2021) (finding a father who failed to plead the absence of willfulness in his response to the petition to terminate parental rights waived it as a defense to the ground of abandonment by failure to support).

Turning to the record, it is undisputed that Father has never met this Child in person. By his own testimony, Father has seen the Child only one time in a video conference. Otherwise, there has been no contact. As noted above, after the filing of the petition to terminate his parental rights, Father moved for visitation. The trial court found that this action was "too little, too late." Specifically, the trial court found that despite Father's desire to have the Child with him, . . . [h]e never earnestly sought visitation . . . until forty-

five (45) to fifty (50) days ago." Indeed, Father's attempt to seek visitation **after** DCS filed its petition to terminate his parental rights is ineffective to undo the fact that he failed to take any steps to visit the Child from her birth until he was in jeopardy of losing his parental rights. Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming visitation . . . subsequent to the filing of any petition seeking to terminate parental . . . rights."). Accordingly, in its final order, the trial court held

> that the Department has proven by clear and convincing evidence the statutory elements of abandonment by failure to visit, as [Father] . . . has abandoned the subject child by failing to visit the [C]hild in the four (4) months preceding the filing of this petition. [Father] has never visited this child. He was aware that the [C]hild was in foster care, but chose not to become involved in this case until after this termination petition was filed. He waited until around February 2021 to file a motion for visitation.

The record, including Father's own testimony, supports the trial court's finding that in the four months preceding the filing of the petition to terminate his parental rights, Father abandoned the Child by failure to visit.

## B. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground for termination of parental rights requires the movant to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). Concerning the first element, DCS has the burden to prove that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child. Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set out in *In re Amynn K.*, No. E2017-11866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018); *see In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *14). The interpretation adopted by our Supreme Court

places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing evidence that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 2020 WL 7258044, at *14. If the first element is met, then DCS must show that placing the Child in Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Concerning the first element, the trial court held:

While [Father] states that he wants to have a relationship with the [C]hild, his actions show otherwise. He did not submit to DNA testing until after being served with this termination petition. Even after being confirmed as the [C]hild's biological father in August 2020, [Father] waited until February 2021 to file a motion for visitation. Further, there are concerns about his home environment.

\*\*\*

[Father has] failed to manifest, by act or omission, an ability and willingness to personally assume financial responsibility of the [C]hild[]. [He has not] demonstrated an ability and willingness to provide financial support for this [C]hild since she entered foster care[, and has] not shown that [he is] in a position to provide for the [C]hild's basic needs.

The record supports the trial court's findings. Father has taken no real initiative to establish paternity, visit, or provide support for the Child. In fact, the initial contact with DCS was made by Father's wife, not Father himself. From the totality of the circumstances, he appears to have taken a wait-and-see approach to pursuing any real relationship with Ni'Kaiya. In 2017, before the Child was born, Father was on notice that he was likely the biological father, yet there is no indication that he provided any support (financial or otherwise) to Mother during the pregnancy or, in fact, after the Child was born. He did not inquire about the Child until his wife contacted DCS after the Child was taken into state custody due to dependency and neglect. Still, Father took no action to establish paternity or to otherwise visit the Child until after DCS petitioned to terminate his parental rights. He has provided no support for the Child and has never met the Child in person. In short, he has failed to manifest either a willingness or an ability to personally assume legal custody or financial responsibility for the Child.

Turning to the second prong of this ground, i.e., that placing the Child in Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the

child," the trial court held, in relevant part that

> [p]lacing the [C]hild[] in the [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. . . . [Father] has no relationship with the [C]hild. . . . The [C]hild is placed, along with her half-siblings, in a loving foster home. The children are very bonded to each other and to their foster parents, who wish to adopt them.

The Child's foster mother testified that Ni'Kaiya is very well adjusted in her current placement. She has a bond with both of her half-brothers, who also live in the home. The Child's bond with Kameron was forged while the children were in Mother's custody, during which time they were the victims of dependency and neglect. As such, this sibling bond is especially strong. The foster mother testified that when the children first came into her custody, Kameron would speak for Ni'Kaiya and would tell the foster mother when Ni'Kaiya needed to be changed or was hungry. As time passed, and the bond with the foster parents grew, Ni'Kaiya's bond with Kameron did not lessen, although the Child is now able to trust the foster parents and to interact with them herself. Likewise, the Child has a strong bond with her younger half-brother, Tyrell. Based on the Child's strong bond with her half-siblings and with her foster family, FSW Jones testified, in relevant part:

> Q. What would your concerns be in placing the child Ni'Kaiya with [Father] at this point?
> A. There would be concerns of regression because she is extremely bonded to both her brothers, as well as the foster parents. She has been with them since . . . she's been one. So she—that's all that she really knows other than her mom. . . . There would also be concerns that [Father] would not be able to properly care for her needs and being able to facilitate the relationship and keep the relationship with her brother due to the distance [the children are in foster placement in Chattanooga, and Father lives in Millington] and just mostly the concerns of how she would function with the family, with his family. Because not only it would just be her leaving, but then she would be going into a home with three children that she did not know as well.

In short, placing Ni'Kaiya in Father's legal or physical custody would be paramount to placing her with a complete stranger, and such action likely would pose "a risk of substantial harm to the physical or psychological welfare of the [C]hild." As such, there is clear and convincing evidence to support the trial court's termination of Father's parental rights on this ground. We now turn to discuss the putative father grounds for termination of Father's parental rights.

### C. Tennessee Code Annotated section 36-1-113(g)(9), Grounds Applicable to Putative Fathers

The trial court also terminated Father's parental rights on the grounds applicable only to putative fathers. These grounds are codified at Tennessee Code Annotated section 36-1-113(g)(9), which provides, in relevant part:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person . . . is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;
(ii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;
(iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;
(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or
(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(2);

(B)(i) For purposes of this subdivision (g)(9), "notice" means the written statement to a person who is believed to be the biological father or possible biological father of the child. The notice may be made or given by the mother, the department, a licensed child-placing agency, the prospective adoptive parents, a physical custodian of the child, or the legal counsel of any of these people or entities; provided, that actual notice of alleged paternity may be proven to have been given to a person by any means and by any person or entity. The notice may be made or given at any time after the child is conceived and, if not sooner, may include actual notice of a petition to terminate the putative father's parental rights with respect to the child;
(ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father, or possible biological father, of the biological mother's child;

- 11 -

In its June 17, 2021 order, the trial court found, in relevant part:

[Father] testified that in early 2017, [Mother] told him that he might be the father of her unborn [C]hild. However, [Father] took no action to establish paternity of the [C]hild, Ni'Kaiya, until after being served with this termination petition. Prior to the filing of this petition, [Father] was aware that this [C]hild was in the custody of the Department and even participated in the adjudicatory hearing by video conference from jail on May 29, 2019. Following his release from incarceration in June 2019, he made no efforts to reach out to the Department about his alleged [C]hild until his wife called DCS FSW, Teara Jones, after he was personally served with this petition. He did not submit to DNA testing until August 2020. Even after receiving the DNA test results in August 2020, he did not file a motion to seek visitation with his [C]hild until around February 2021.

For the reasons previously discussed, the record supports the trial court's finding that Father "has failed to seek reasonable visitation with the child . . . ." Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii). The trial court also found that Father failed to "make reasonable and consistent payments for the support of the [C]hild." Tenn. Code Ann. §36-1-113(g)(9)(A)(i). The record supports this finding. By his own testimony, Father's sole contribution was approximately $25, which he gave to the Child for her birthday. As previously discussed, the trial court held that Father "has failed to manifest an ability and willingness to assume legal and physical custody of the child," and the record supports this finding. Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii). Furthermore, the record shows that Father failed to establish paternity after DNA testing revealed that he is the Child's biological father. Tenn. Code Ann. § 36-1-113(g)(9)(A)(v). Finally, the record indicates that "[p]lacing custody of the child in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(9)(iv), *see* discussion *supra*.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793 at 809). As the Tennessee Supreme Court explained:

Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they

- 12 -

amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> ***
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> ***
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe. . .
>
> ***
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2020). This list of factors is not exhaustive, nor does the statute "require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*,

183 S.W. 3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Each termination of parental rights case includes different circumstances, and the consideration of a single factor or other factors outside those enumerated in the statute, may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s [] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994). However, "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

In its order terminating Appellant's parental rights, the trial court made the following findings concerning the Child's best interest:

> [Father] waited a year and a half to become involved in this case, even though he knew NiKaiya was his daughter and that she was in the Department's custody. . . . The Court finds that it is in the best interest of the [C]hild for termination to be granted as to [Father] because [he has] not maintained regular visitation with the [C]hild. . . . [Father] has never visited the [C]hild and did not seek visitation with her until recently. . . . The Court finds it is in the best interest of the [C]hild for termination to be granted as to [Father] because there is no meaningful relationship between [him] and the [C]hild. The [C]hild does not know [Father] at all. . . . The Court finds that it is in the best interest of the [Child] for termination to be granted as to [Father] because changing caregivers at this stage of the [C]hild's life would be detrimental to the [C]hild's successful development and well-being. The [C]hild has been through a lot in her young life. Even given her early circumstances, the [C]hild is stable, continues to improve, and is meeting her developmental milestones. She is intelligent and doing well. The [C]hild has an obvious bond with her half-siblings and the foster family. . . . . [The foster parents] wish to adopt the [C]hild and her half-siblings, should they become available for adoption . . . . The Court finds that it is in the best interest of the [C]hild for termination to be granted as to [Father] because [he has] not paid child support consistently.

For many of the reasons previously discussed, the record supports the trial court's best interest findings. Father has not visited the Child, nor has he provided any support for her. Although Father had notice of his likely paternity prior to the Child's birth, and then confirmed that fact through DNA testing, he demonstrated no sense of urgency to establish paternity. In fact, at the time of the hearing, there had been no adjudication of paternity, and Father's parental status remained merely putative. In short, Father is a stranger to the Child. There is no bond between Father and the Child, and she considers her foster parents to be her mother and father.

By all accounts, the Child's current foster placement has provided her with a stable and loving environment, where all of her needs are more than met. Importantly, she is placed in the home with her half-brothers, with whom she is extremely bonded. To remove the Child from these half-siblings and from the only stable home she has known would pose a substantial risk of psychological harm. Furthermore, the foster parents wish to adopt all three of the children in their care. At this point in the Child's life, the continuation of the parent/child relationship between Father and Child would merely work to delay the Child's permanent placement in the foster family's home with her brothers. From the totality of the circumstances, the termination of Father's parental rights is certainly in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Father/Appellant's parental rights to Ni'Kaiya R. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Charles M. Because Charles M. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____s/ Kenny Armstrong_____
KENNY ARMSTRONG, JUDGE